IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CHAD BURNS and DAVID TORRES, On Behalf of Themselves and all Others Similarly Situated, | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 5:15-cv-1016 |
| V. | § | |
| | § | COLLECTIVE AND CLASS ACTION |
| CHESAPEAKE ENERGY, INC., WILD PURGE I, LLC., and JOHN DOE DEFENDANTS 1 to 5 | § § § | JURY TRIAL DEMANDED |
| | § | |
| Defendants | § | |

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

Plaintiffs, Chad Burns ("Burns") and David Torres ("Torres") (collectively "Plaintiffs"), file this Complaint against Chesapeake Energy, Inc. ("Chesapeake"), Wild Purge I, LLC ("Wild Purge") (Chesapeake and Wild Purge are collectively referred to as "Defendants" herein), and John Doe Defendants 1 to 5 ("John Doe Defendants"), showing in support as follows:

## I.    SUMMARY

1.      At times relevant, Plaintiffs worked exclusively for Chesapeake as oilfield workers performing pumper and/or gauger related job duties in connection with Chesapeake's oilfield operations in and around the Eagle Ford Shale area of South Texas. However, Plaintiffs were issued paychecks for their work for Chesapeake by Wild Purge pursuant to invoices submitted to Wild Purge. Wild Purge also issued Plaintiffs 1099s in connection with those payments. Plaintiffs were paid a day rate in connection with their work for Chesapeake, and Wild Purge received a percentage of that day rate pay from Chesapeake in connection with issuing paychecks and 1099s to Plaintiffs.

A.    **FLSA Independent Contractor Misclassification Overtime Claims**

2.    Plaintiffs were misclassified independent contractors by Chesapeake and/or Wild Purge. Under the economic realities test of the FLSA, were Plaintiffs were employees of Chesapeake and/or Wild Purge. Furthermore, under the FLSA, Chesapeake and Wild Purge are joint employers of Plaintiffs and are jointly and severally liable for the FLSA damages sought in this lawsuit.

3.    Plaintiffs regularly worked in excess of 40 hours per workweek while performing their respective job duties for Chesapeake. However, they were never paid time and one-half their respective regular rates of pay by any Defendant in this lawsuit for any hours worked over 40 in a workweek during their work for Chesapeake.

4.    There exist many other oilfield workers performing the same or substantially similar job duties as Plaintiffs who also are/were misclassified by Chesapeake and/or Wild Purge as so-called independent contractors in connection with Chesapeake's oilfield operations. Like Plaintiffs, those other misclassified independent contractors were paid a day rate in connection with performing pumper and/or gauger job duties exclusively for Chesapeake, worked in excess of 40 hours per workweek, but were not paid time and one-half their respective regular rates of pay for all hours worked over 40 in an workweek by any Defendant in this lawsuit.

5.    As a result of the independent contractor misclassification, Plaintiffs and the other misclassified independent contractors do not/did not enjoy and receive the benefits of employment, such as overtime wages, health insurance benefits, and retirement benefits.

6.    Plaintiffs seek to recover unpaid overtime wages and all available damages under the federal Fair Labor Standards Act, 29 U.S.C. §§ 201-219, and the federal Portal-to-Portal Pay Act, 29 U.S.C. §§ 251-262, (collectively "FLSA") for Chesapeake's and/or Wild Purge's failure

to pay Plaintiffs time and one-half their respective regular rates of pay for all hours worked over 40 during each seven day workweek while working as pumpers and/or gaugers for Chesapeake (the "FLSA IC Misclassification Overtime Claim").

7.    Plaintiffs files this FLSA IC Misclassification Overtime Claim individually and on behalf of all others similarly situated as a FLSA collective action pursuant to 29 U.S.C. § 216(b) against Chesapeake, Wild Purge and/or the John Doe Defendants.

### B.    The Wage Theft Claims

8.    In approximately the first quarter of 2015, Wild Purge ceased paying Burns and other workers in connection with their work performed exclusively for Chesapeake for which they timely submitted invoices to Wild Purge (the "Wage Theft"). The John Doe Defendants are added in this lawsuit, in part, to address any presently unknown individual(s) and/or successor company/companies who are or may be liable to Burns and all others similarly situated for that Wage Theft as identified in discovery in this lawsuit.

### 1.    FLSA Minimum Wage and Overtime Wage Theft Claims

9.    As a result of the Wage Theft, Chesapeake, Wild Purge and/or the John Doe Defendants failed to pay Burns and many other misclassified independent contractors any remuneration for work they performed exclusively for Chesapeake in approximately February 2015 to approximately April 2015 despite Burns and the other similarly situated misclassified independent contractors timely submitting invoices for that work. As joint employers, Chesapeake and Wild Purge are jointly liable for violations of the FLSA's overtime and minimum wage laws relative to that Wage Theft. Burns, on behalf of himself and all others similarly situated, seeks recovery of those FLSA overtime and minimum wage damages as a

FLSA collective action pursuant to 29 U.S.C. § 216(b) against Chesapeake, Wild Purge and/or the John Doe Defendants. (the "FLSA Wage Theft Claim").

**2.    Texas State Law Wage Theft Claims**

10.    Furthermore, as common law employees under Texas Law, Burns seeks recovery of all straight time wages owed by Chesapeake, Wild Purge and/or the John Doe Defendants for the aforementioned Wage Theft. Alternatively, Burns seeks recovery of all straight time wages owed by Chesapeake, Wild Purge and/or the John Doe Defendants for the aforementioned Wage Theft under the Texas Law principles of quantum meruit and/or money had and money received. Burns files his Texas State Law Claims for the aforementioned Wage Theft individually and as the representative of the putative class members pursuant to Federal Rule of Civil Procedure 23 (the "Texas State Law Wage Theft Claim").

**II.    THE PARTIES, JURISDICTION, AND VENUE**

**A.    Plaintiff Chad Burns**

11.    Burns is a natural person and is currently a resident of California. He has standing to file this lawsuit.

12.    Burns worked exclusively for Chesapeake, and under the control of Chesapeake, as a pumper and/or gauger from approximately September 2015 to March 2015 in and around Chesapeake's oilfield operations in South Texas. Burns was paid a day rate for his work for Chesapeake through invoices submitted to Wild Purge and paychecks issued by Wild Purge. Although Burns routinely worked in excess of 40 hours per workweek, Chesapeake and/or Wild Purge did not pay him any corresponding overtime premium compensation for his overtime hours worked.

13.    Also, although Burns performed work for Chesapeake in approximately February 2015 to April 2015, and timely submitted invoices for that work to Wild Purge, he was not paid any wages for several workweeks worked in that time period due to Wage Theft by Chesapeake, Wild Purge, and/or the John Doe Defendants.

**B.    Plaintiff David Torres**

14.    Torres is a natural person and resident of Texas. He has standing to file this lawsuit.

15.    Torres worked exclusively for Chesapeake, and under the control of Chesapeake, as a pumper and/or gauger from approximately March 2014 to January 2015 in and around Chesapeake's oilfield operations in South Texas. Torres was paid a day rate for that work through invoices submitted to Wild Purge and paychecks issued by Wild Purge. Although Torres routinely worked in excess of 40 hours per workweek, Chesapeake and/or Wild Purge did not pay him any corresponding overtime premium compensation for his overtime hours worked.

16.    Torres does not allege Wage Theft Claims in this lawsuit. On information and belief, the Wage Theft issues began in approximately February 2015, which was after the date Torres ceased work for Chesapeake and/or Wild Purge.

**C.    FLSA Collective Action Members**

**1.    FLSA IC Misclassification Overtime Claim**

17.    The FLSA IC Misclassification Overtime Claim putative collective action members (hereafter the "FLSA IC Misclassification Putative Collective Action Members") are all current and/or former misclassified independent contractors similarly situated to Plaintiffs who: (a) work/worked exclusively for Chesapeake in connection with Chesapeake's oilfield operations performing the job duties of pumpers and/or gaugers, but are/were issued paychecks

and/or 1099s from Wild Purge; (b) are/were paid on a day rate basis; (c) work/worked more than 40 hours in any workweek in the relevant time period; and (d) are/were not paid time and one-half their respective regular rates of pay for all hours worked over 40 in each such workweek by Chesapeake and/or Wild Purge.

18.     All of the FLSA IC Misclassification Putative Collective Action Members are similarly situated to Plaintiffs, and to one another, within the meaning of Section 216(b) of the FLSA.

19.     The time period relevant to the claims of the FLSA IC Misclassification Putative Collective Action Members is three years preceding the date this lawsuit was filed and forward.

### 2.     FLSA Wage Theft Claim

20.     The FLSA Wage Theft Claim putative collective action members (hereafter the "FLSA Wage Theft Putative Collective Action Members") are all current and/or former misclassified independent contractors similarly situated to Burns who: (a) worked exclusively for Chesapeake in connection with Chesapeake's oilfield operations performing the job duties of pumpers and/or gaugers; (b) submitted invoices to Wild Purge and/or the John Doe Defendants for that work in the approximate time period of February 2015 to April 2015; (c) but were not paid remuneration by Chesapeake, Wild Purge, and/or the John Doe Defendants for that work, which included work in excess of 40 hours per workweek. Like Burns, the FLSA Wage Theft Putative Collective Action Members were not paid all minimum and overtime wages owed by Chesapeake, Wild Purge, and/or the John Doe Defendants due to the Wage Theft.

21.     All of the FLSA Wage Theft Putative Collective Action Members are similarly situated to Burns, and to one another, within the meaning of Section 216(b) of the FLSA.

22.     The time period relevant to the claims of the FLSA Wage Theft Putative Collective Action Members is, on information and belief, February 2015 to April 2015. However, Burns reserves the right to modify this time period based on facts identified in discovery through and amended pleading and/or a class certification motion.

**D.      Texas State Law Claim Rule 23 Class Members**

23.     The Texas State Law Wage Theft Claim Rule 23 Class Members (hereafter "State Law Wage Theft Class Members") are similarly situated workers to Burns who: (a) worked exclusively for Chesapeake as pumpers and/or gaugers in approximately February 2015 to April 2015; (b) timely submitted invoices for that work to Wild Purge; (c) but were not paid any wages for several workweeks worked in that time period due to Wage Theft by Chesapeake, Wild Purge, and/or the John Doe Defendants.

24.     As common law employees under Texas Law, Burns and the State Law Wage Theft Class Members seek recovery of all straight time wages owed by Chesapeake, Wild Purge and/or the John Doe Defendants for the aforementioned Texas State Law Wage Theft Claim.

25.     Alternatively, Burns and the State Law Wage Theft Class Members seek recovery of all straight time wages and other damages owed by Chesapeake, Wild Purge and/or the John Doe Defendants for the Texas State Law Wage Theft Claim under the Texas Law principles of quantum meruit and/or money had and money received.

**E.      Defendant Chesapeake Energy, Inc.**

26.     On information and belief, Chesapeake is a for-profit corporation incorporated under the laws of the State of Oklahoma.

27.     During all times relevant to this lawsuit, Chesapeake has done business in the State of Texas. Furthermore, Chesapeake employed and continues to employ oilfield workers in Texas.

28.     Chesapeake's principal office and principal place of business is located at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

29.     At times relevant, Chesapeake is and/or was an "employer" and/or "joint employer" of Plaintiffs and the FLSA IC Misclassification Putative Collective Action Members.

30.     At times relevant, Chesapeake is and/or was an "employer" and/or "joint employer" of Burns and the FLSA Wage Theft Putative Collective Action Members.

31.     At times relevant, Burns and the State Law Wage Theft Class Members are/were Texas common law employees of Chesapeake.

32.     At all times relevant to this lawsuit, Chesapeake is and has been an "enterprise engaged in commerce" as defined by the FLSA.

33.     At all times relevant to this lawsuit, Chesapeake employed, and continues to employ, two or more employees who engaged in commerce. For example, Chesapeake has, at all relevant times, had two or more employees engaged in interstate oil and natural gas exploration and production services.

34.     At all times relevant to this lawsuit, Chesapeake employed two or more employees who regularly handled and/or worked on goods and/or materials in their daily work that were moved in and/or produced for commerce by other people. Examples of such goods and/or materials include computers, computer related equipment, communication devices, and safety equipment used in connection with Chesapeake's oil and natural gas exploration and production operations.

*Plaintiffs' Complaint for Damages – Page 8*

35.     On information and belief, at all times relevant to this lawsuit, Chesapeake has had annual gross sales or business volume in excess of $500,000.

36.     Chesapeake engages in business in Texas, but has not designated a registered agent with the Texas Secretary of State. Therefore, Chesapeake may be served with summons by serving the Texas Secretary of State, 1019 Brazos Street, Austin Texas 78701.

**F.     Wild Purge I, LLC**

37.     Wild Purge is a for-profit limited liability company incorporated under the laws of the State of Texas. Wild Purge forfeited its authority to transact business in Texas for the failure to file a franchise tax return and/or pay state franchise taxes on or about February 20, 2015. However, Wild Purge was reinstated to transact business on or after approximately March 15, 2015.

38.     During times relevant to this lawsuit, Wild Purge has done business in the State of Texas. Furthermore, Wild Purge employed Plaintiffs and other employees in Texas.

39.     Wild Purge's principal office and principal place of business is located at 1100 NW Loop 410, Suite 503, San Antonio, Texas 78213.

40.     At times relevant, Wild Purge is and/or was an "employer" and/or "joint employer" of Plaintiffs and the FLSA IC Misclassification Putative Collective Action Members pursuant to the FLSA.

41.     At times relevant, Wild Purge is and/or was an "employer" and/or "joint employer" of Burns and the FLSA Wage Theft Putative Collective Action Members.

42.     At all times relevant to this lawsuit, Wild Purge is and has been an "enterprise engaged in commerce" as defined by the FLSA.

43.     At all times relevant to this lawsuit, Wild Purge employed, and continues to employ, two or more employees who engaged in commerce. For example, Wild Purge has, at all relevant times, had two or more employees engaged in work for other companies who perform interstate oil and natural gas exploration and production services.

44.     At all times relevant to this lawsuit, Wild Purge employed two or more employees who regularly handled and/or worked on goods and/or materials in their daily work that were moved in and/or produced for commerce by other people. Examples of such goods and/or materials include office equipment, such as computers, computer related equipment, and communication devices.

45.     On information and belief, at all times relevant to this lawsuit, Wild Purge has had annual gross sales or business volume in excess of $500,000.

46.     Wild Purge may be served with summons by serving its registered agent, Ward Nohavitza, 1100 NW Loop 410, San Antonio, Texas 78213.

**G.      John Doe Defendants 1 to 5**

47.     Plaintiffs, on information and belief, have added the John Doe Defendants to address any additional relevant employers/responsible third parties found to exist after the filing of this Complaint that are liable, in whole or in part, for the: (a) FLSA IC Misclassification Overtime Claim; (b) FLSA Wage Theft Claim; and/or (c) Texas State Law Wage Theft Claim.

**H.      Jurisdiction and Venue**

48.     The Court has personal jurisdiction over Defendants based on both general and specific jurisdiction.

49.     During all times relevant to this lawsuit, Defendants have done business in the State of Texas and continue to do business in the State of Texas.

50.    The Court has subject matter jurisdiction over this case based on federal question jurisdiction, 28 U.S.C. § 1331, because Plaintiffs base their claims on federal law, namely the FLSA.

51.    Venue is proper in the United States District Court for the Western District of Texas because a substantial part of the events giving rise to Plaintiffs' claims occurred, and continue to occur, in this judicial district. Furthermore, Chesapeake maintains oilfield business operations in this judicial district where Plaintiffs performed work.

52.    Venue is proper in the San Antonio Division of the United States District Court for the Western District of Texas because Chesapeake maintains business operations in the San Antonio Division and a substantial part of the events giving rise to Plaintiffs' claims occurred, and continue to occur, in the San Antonio Division.

53.    This Court has supplemental jurisdiction over the Texas State Law Wage Theft Claim pursuant to 28 U.S.C. § 1367 as the facts relative to that claim form part of the same case or controversy as the FLSA Wage Theft Claim.

### III.    FACTUAL BACKGROUND

54.    Plaintiffs incorporate the preceding paragraphs by reference as if set forth fully in this section.

55.    Chesapeake is one of the largest oil and natural gas companies in the United States and has business operations in Texas and states other than Texas. Chesapeake has significant business operations in the Eagle Ford Shale area of South Texas.

56.    Wild Purge is, on information and belief, a workforce staffing company which provides oil and gas companies, like Chesapeake, with workforce personnel and issues paychecks and 1099s to those workers. Although the workers work full time for and under the

control of Chesapeake, Chesapeake uses Wild Purge in an effort to make workers, like Plaintiffs, appear as if they are not employees of Chesapeake. As a result, Chesapeake attempts to evade obligations owed to workers it labels as employees, such as overtime pay, health benefits, disability benefits and/or retirement benefits, Federal Insurance Contributions Act ("FICA") taxes, state unemployment taxes, and other obligations.

57.     Although Plaintiffs never signed an independent contractor agreement with Chesapeake and/or Wild Purge, at all times relevant, Plaintiffs were paid as independent contractors by Chesapeake and/or Wild Purge. Although Plaintiffs routinely worked over 40 hours per workweek while working for Chesapeake, and do not meet any FLSA exemption, they were never paid time and one-half their respective regular rates of pay for all hours worked over 40 in a workweek by Chesapeake and/or Wild Purge. Chesapeake and/or Wild Purge made no deductions made from Plaintiffs' respective paychecks for FICA and state unemployment taxes. Plaintiffs were issued 1099s, as opposed to W-2s, by Wild Purge relative to their work for Chesapeake.

58.     Burns worked exclusively for Chesapeake from approximately September 2014 to March 2015. Torres worked exclusively for Chesapeake from approximately March 2014 to January 2015

59.     The work performed by Plaintiffs benefited Chesapeake and Wild Purge at the same time. For example, Chesapeake enjoyed the labor of Plaintiffs, who were integral parts of its workforce, while Wild Purge received compensation from Chesapeake in return for providing Plaintiffs as workers for Chesapeake, processing their invoices, and issuing paychecks and 1099s based on work performed by Plaintiffs for Chesapeake. Similarly, Chesapeake and Wild Purge benefitted financially from their scheme/plan/practice/policy to classify Plaintiffs as independent

contractors thereby dodging overtime pay, FICA taxes, state unemployment taxes, and other costs and taxes associated with workers classified as "employees."

60.    Plaintiffs worked for Chesapeake as pumpers and/or gaugers in and around the Eagle Ford Shale area of South Texas. Pumpers and/or gaugers, such as Plaintiffs, have job duties which typically include driving to various wellsites to check, maintain, and if possible, repair, pump jacks, tank batteries, compressors, motors, and other oil and/or natural gas production field equipment. Additionally, pumpers and/or gaugers, such as Plaintiffs, provide reports to Chesapeake, including reporting equipment that they cannot repair which requires additionally equipment and/or services.

61.    At times relevant, Plaintiffs were paid on a day rate basis for work performed for Chesapeake. At all times relevant, Plaintiffs were not paid on a salary or fee basis as those phrases are understood pursuant to the FLSA.

62.    Chesapeake and/or Wild Purge paid Plaintiffs as so-called independent contractors. However, the reality under the FLSA is that Plaintiffs were Chesapeake's and/or Wild Purge's employees/joint employees at all material times.

63.    Chesapeake, primarily through its dispatchers, set the weekly work schedule/work assignments for Plaintiffs. Plaintiffs were expected and required to work full time for Chesapeake, which in oilfield operations such as those performed by Plaintiffs are regularly workweeks that significantly exceed 40 hours per week.

64.    Plaintiffs reported to/were managed by Tommy McElroy, who was a Chesapeake employee and manager, on a daily basis. Chesapeake also required Plaintiffs to participate in meetings twice per week that were presented by Chesapeake managers.

65.     Chesapeake provided Plaintiffs with the major supplies and equipment needed to perform their job duties for Chesapeake. Examples include tools and supplies needed to perform pumper and/or gauger job duties on Chesapeake's oilfield locations/equipment. Plaintiffs were instructed in the manner in which to do their jobs by Chesapeake managers.

66.     Plaintiffs were not permitted and did not hire employees to assist them with their work for Chesapeake.

67.     Plaintiffs did not exercise sufficient, if any, control over a meaningful part of the business so as to respectively be separate economic entities from Chesapeake. Plaintiffs were simply a part of Chesapeake's workforce performing job duties and work that were an integral part of Chesapeake's business operations.

68.     Similarly, Plaintiffs did not exercise sufficient, if any, control over a meaningful part of the business so as to respectively be separate economic entities from Wild Purge. Plaintiffs were simply Chesapeake workers that Wild Purge paid and issued 1099s relative to work they performed for Chesapeake. Wild Purge received remuneration from Chesapeake for the work Plaintiffs performed for Chesapeake. On information and belief, that compensation was a percentage of that day rate earned for work performed by Plaintiffs for Chesapeake.

69.     Plaintiffs did not provide material investment in Chesapeake's and/or Wild Purge's business operations, and each Defendant's investment in its business operations exceeds the investments, if any, of each Plaintiff in connection with their respective work for Chesapeake and/or Wild Purge.

70.     At all times relevant, Plaintiffs were economically dependent on Chesapeake and/or Wild Purge. For example, although Wild Purge issued paychecks to Plaintiffs, Chesapeake required/permitted Plaintiffs to perform the work which resulted in those paychecks.

The work demand from Chesapeake prevented Plaintiffs from a meaningful opportunity for earned income from a source other than Chesapeake through paychecks issued by Wild Purge.

71.    Plaintiffs were paid a day rate by Wild Purge for the work they performed for Chesapeake. The more days Plaintiffs worked, the more money they made. Plaintiffs did not and could not hire employees of their own while working for Chesapeake and/or Wild Purge. Similarly, Plaintiffs did not and could not subcontract the work assigned to them by Chesapeake. Plaintiffs had no opportunity for loss. Instead, there was only opportunity for earned income based upon days worked for Chesapeake that were paid by Wild Purge.

72.    All major components open to initiative, such as advertising, pricing, and business decision making, were controlled by Chesapeake and/or Wild Purge, not Plaintiffs.

73.    Chesapeake and/or Wild Purge did not make and keep a record of all of the data required by 29 C.F.R. § 516.2(a) in connection with the work performed by Plaintiffs for Chesapeake and/or Wild Purge.

74.    Plaintiffs routinely worked in excess of 40 hours in a workweek for Chesapeake and/or Wild Purge. When Plaintiffs worked in excess of 40 hours in a workweek, they were not paid corresponding overtime premium compensation as required by the FLSA by Chesapeake and/or Wild Purge.

75.    In addition to not being paid overtime premium compensation for overtime hours worked, Plaintiffs were not paid/provided benefits enjoyed by workers classified as employees by Chesapeake. Such benefits include health benefits, disability benefits, and retirement benefits.

76.    During the time period relevant to Plaintiffs' FLSA causes of action, Chesapeake had many other workers performing similar work and being paid in similar, if not identical, fashion to Plaintiffs who, like Plaintiffs, were misclassified as independent contractors. Like

Plaintiffs, those workers were paid on a day rate basis by Wild Purge for work they performed at the discretion and control of Chesapeake. Like Plaintiffs, those workers were issued pay checks and 1099s by Wild Purge for work performed exclusively for Chesapeake. Like Plaintiffs, those workers were supervised by Chesapeake managers, worked exclusively for Chesapeake at the direction of Chesapeake, and were provided with all material supplies and equipment to do their jobs by Chesapeake. Like Plaintiffs, those workers worked for long periods of time, routinely in excess of one year, exclusively for Chesapeake and/or Wild Purge, and had no control over their opportunity for profit or loss. Like Plaintiffs, those workers did not make material investments in Chesapeake's and/or Wild Purge's business operations, and each Defendant's investment in its business operations exceeds the investments, if any, of each individual misclassified independent contractor in connection with their respective work for Chesapeake and/or Wild Purge. Like Plaintiffs, those other misclassified independent contractors were economically dependent on Chesapeake and/or Wild Purge. Like Plaintiffs, those workers regularly worked in excess of 40 hours in a workweek, but were not paid time and one-half their respective regular rates of pay by Chesapeake and/or Wild Purge for all hours worked over 40 in each and every such workweek during the relevant time period.

77.     In approximately February 2015 to April 2015, Burns provided work exclusively for Chesapeake and submitted invoices to Wild Purge for that work. However, during that time period, Burns was not paid compensation for many weeks of work provided to Chesapeake. During that same approximate time period, many other pumpers and/or gaugers also performed work exclusively for Chesapeake, but were not paid compensation for many weeks of work for Chesapeake. As of the filing of this lawsuit, Chesapeake, Wild Purge and/or the John Doe

Defendants have not paid Burns and the FLSA Wage Theft Putative Collective Action Members the minimum wages and/or overtime wages they are owed for those workweeks.

78.     Similarly, as of the filing of this lawsuit, Chesapeake, Wild Purge and/or the John Doe Defendants have not paid Burns and the State Law Wage Theft Class Members the regular wages and other damages they are owed for those workweeks. Burns and the State Law Wage Theft Class Members performed that pumper and/or gauger work for Chesapeake, and Chesapeake, Wild Purge and/or the John Doe Defendants were aware that work was performed. Burns and the State Law Wage Theft Class Members performed that work for Chesapeake with the expectation that they would be paid that work. However, as of the filing of this lawsuit, they have not been paid for that work made the subject matter of the Wage Theft Claims. In connection with those Wage Theft Claims, Chesapeake, Wild Purge and/or the John Doe Defendants have money which in equity and good conscience belongs Burns and the State Law Wage Theft Class Members.

## IV.    CONTROLLING LEGAL RULES

79.     "Employ" includes to suffer or permit work. 29 U.S.C. § 203(g).

80.     The FLSA generally requires that an employer employing an employee for a workweek exceeding 40 hours must compensate the employee for hours worked over 40 "at a rate not less than one and one-half times the regular rate of pay." 29 U.S.C. § 207(a)(1). The "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). With a few limited exceptions, all remuneration given to an employee must be included in the employee's regular rate calculation. 29 U.S.C. § 207(e); 29 C.F.R. § 778.108; *accord Allen v. Board of Pub. Educ. For Bibb Cty.*, 495 F. 3d 1306, 1311 (11th Cir. 2007); *see also Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 927 (E.D. La. 2009).

81.     Failing to pay the required overtime premium for hours worked over 40 in a workweek is a violation of the FLSA. 29 U.S.C. § 216.

82.     The FLSA generally requires that an employer shall pay to each of its employees who in any workweek is engaged in commerce or in the production of goods for commerce or is employed in an enterprise engaged in commerce or in the production of goods for commerce wages of not less than $7.25 for each hour worked. 29 U.S.C. § 206(a)(1)(C).

83.     Failing to pay the required minimum hourly wage is a violation of the FLSA. 29 U.S.C. § 216.

84.     Whether an individual is an employee, who is covered by the FLSA's provisions, as opposed to an independent contractor, who is not covered by the FLSA, is determined by the economic realities test. *Hopkins,* 545 F.3d at 343. The purpose of the economic realities test is to determine whether "the worker is economically dependent upon the alleged employer or is instead in business for himself." *Id.*

85.     District Courts within the Fifth Circuit consider the following five factors in assessing the economic reality of the working relationship: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* at 343 (*citing Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir. 1998). The Fifth Circuit further noted that: "[n]o single factor is determinative. Rather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind." *Id.* (*citing*

*Herman*, 161 F.3d at 303 and *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043-44 (5th Cir. 1987)).

86.     The FLSA recognizes the doctrine of joint employers. "Where an employee performs work that simultaneously benefits more than one employer, the concept of 'joint employment' imposes individual and joint FLSA liability on all employers." *Parker v. ABC Debt Relief, Ltd. Co.*, Civil Action No. 3:10-cv-1332-P, 2013 U.S. Dist. LEXIS 12859, at *13 - 20 (N.D. Tex. Jan. 28, 2013) (Solis, J.) (citing *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968).

87.     "[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13; *accord Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) (same).

88.     Federal law requires employers to make and keep accurate and detailed payroll data for non-exempt employees. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2. Amongst other things, the regulations require employers to make and keep payroll records showing data such as the employee's name, social security number, occupation, time of day and day of week which the workweek begins, regular hourly rate of pay for any week in which overtime pay is due, hours worked each workday and total hours worked each workweek, total daily or weekly straight time earnings, total premium pay for overtime hours, total wages paid each pay period and date of payment and pay period covered by the payment, and records of remedial payments. 29 C.F.R. § 516.2(a)&(b). Employers are required to maintain the foregoing data for a minimum of three years. 29 C.F.R. § 516.5.

89.     Under Texas Law, "[t]he test to determine whether a worker is an employee rather than an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the work." *Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 655 (5th Cir. 2012) (citing *Limestone Products Distribution, Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002)). "Texas courts generally consider five factors when analyzing whether an employer has a right to control a person's work: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish the necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether the worker is paid by unit of time or by the job." *Mid-Continent Cas. Co.*, 683 F.3d at 655 (citing *Limestone*, 71 S.W.3d at 312).

90.     Quantum meruit is an equitable remedy based on the promise implied by law to pay for beneficial services rendered and knowingly accepted. *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990). To recover under quantum meruit, it must be established that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 917 (Tex. App. Dallas 2008) (citing *Vortt*, 787 S.W.2d at 944; *Bashfara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985)).

91.     "Money had and received is an equitable action that may be maintained to prevent unjust enrichment when one person obtains money which in equity and good conscience belongs

to another." *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 507 (Tex. App. Fort Worth 2012, no pet. h.) (*citing Staats v. Miller*, 243 S.W.2d 686, 687 (1951); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.); *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ) (stating that cause of action for money had and received belongs conceptually to doctrine of unjust enrichment)). To succeed in a claim for money had and received, it must be shown that the defendant holds money or its equivalent that, in equity and good conscience, belongs to the plaintiff. *Best Buy v. Barrera,* 248 S.W.3d 160, 162-163 (Tex. 2007) (per curiam); *MGA Ins. Co. v. Charles R. Chesnutt, P.C.,* 358 S.W.3d 808, 813 (Tex. App.--Dallas 2012, no pet. h.). The cause of action for money had and received is "less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which … belongs to the plaintiff." *H.E.B.,* 369 S.W.3d at 507.

## V.    **PLAINTIFFS' CLAIMS**

92.    Plaintiffs incorporate the preceding paragraphs by reference as if set forth fully in this section.

93.    This action is authorized and instituted pursuant to the FLSA. 29 U.S.C. §§ 201, *et seq*.

94.    All conditions precedent to this suit, if any, have been fulfilled.

95.    At all times relevant, Plaintiffs were employee of Chesapeake and/or Wild Purge pursuant to the FLSA. 29 U.S.C. § 203(e); *Wirtz*, 405 F.2d at 669-70. Although Chesapeake and/or Wild Purge classified and/or paid Plaintiffs as a so-called independent contractors, the economic reality is that Plaintiffs were employees of Chesapeake and/or Wild Purge. Additionally, Chesapeake and/or Wild Purge were  joint employers of Plaintiffs.

96.     At all material times, Chesapeake has been an eligible and covered employer pursuant to the FLSA. 29 U.S.C. § 203(d).

97.     At all material times, Wild Purge has been an eligible and covered employer pursuant to the FLSA. 29 U.S.C. § 203(d).

98.     Plaintiffs routinely worked in excess of 40 hours per seven-day workweek for Chesapeake and/or Wild Purge. When they worked such overtime hours for Chesapeake and/or Wild Purge, Plaintiffs were entitled to overtime compensation at one and one-half times their respective regular rates of pay for all hours worked over 40 in a workweek. 29 U.S.C. § 207(a)(1).

99.     Chesapeake and/or Wild Purge failed to pay Plaintiffs overtime compensation at one and one-half times their respective regular rates of pay for all hours worked over 40 in each and every seven-day workweek during the time period relevant to this lawsuit.

100.    Chesapeake and/or Wild Purge did not maintain an accurate number of the daily and weekly hours worked respectively by Plaintiffs during the relevant time period of Plaintiffs' claims in this lawsuit. 29 C.F.R. § 516.2.

101.    Chesapeake's and/or Wild Purge's violations of the FLSA are and were willful within the meaning of 29 U.S.C. § 255(a). *See Singer v. City of Waco*, 324 F.3d 813, 821-22 (5th Cir. 2003) (upholding a jury finding of willfulness).

102.    Plaintiffs seek all damages available for Chesapeake's and/or Wild Purge's violations of the FLSA.

## VI.    FLSA COLLECTIVE ACTION ALLEGATIONS

103.    Plaintiffs incorporate the preceding paragraphs by reference as if set forth fully in this section.

A.      **FLSA IC Misclassification Overtime Claim Collective Action**

104.    The FLSA IC Misclassification Overtime Claim collective action includes Plaintiffs and the FLSA IC Misclassification Putative Collective Action Members, which are all current and/or former misclassified independent contractors similarly situated to Plaintiffs who: (a) work/worked exclusively for Chesapeake in connection with Chesapeake's oilfield operations performing the job duties of pumpers and/or gaugers, but are/were issued paychecks and/or 1099s from Wild Purge; (b) are/were paid on a day rate basis; (c) work/worked more than 40 hours in any workweek in the relevant time period; and (d) are/were not paid time and one-half their respective regular rates of pay for all hours worked over 40 in each corresponding workweek by Chesapeake and/or Wild Purge.

105.    All of the IC Misclassification Putative Collective Action Members are similarly situated to Plaintiffs, and to one another, within the meaning of Section 216(b) of the FLSA.

106.    The time period relevant to the claims of the IC Misclassification Putative Collective Action Members is three years preceding the date this lawsuit was filed and forward.

107.    Where, as here, the employer's actions or policies were effectuated on a companywide basis, notice may be sent to all similarly situated persons on a companywide basis. *See Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 825 (N.D. Tex. 2007) (certifying nationwide collective action in FLSA case); *see also*, *Jones v. SuperMedia Inc.,* 281 F.R.D. 282, 290 (N.D. Tex. 2012) (same).

108.    Plaintiffs reserve the right to establish sub-classes and/or modify class notice language as appropriate in any collective action certification motion or other proceeding relative to the IC Misclassification Putative Collective Action Members.

109.    Plaintiffs further reserve the right to amend the definition of the IC Misclassification Putative Collective Action Members, or establish sub classes if discovery and further investigation reveal that the putative class should be expanded or otherwise modified.

### B.    FLSA Wage Theft Claim Collective Action

110.    The FLSA Wage Theft Claim collective action includes Burns and the FLSA Wage Theft Putative Collective Action Members, which are all current and/or former misclassified independent contractors similarly situated to Burns who: (a) worked exclusively for Chesapeake in connection with Chesapeake's oilfield operations performing the job duties of pumpers and/or gaugers; (b) submitted invoices to Wild Purge and/or the John Doe Defendants for that work in the approximate time period of February 2015 to April 2015; (c) but were not paid remuneration by Chesapeake, Wild Purge, and/or the John Doe Defendants for that work, which included work in excess of 40 hours per workweek.

111.    All of the FLSA Wage Theft Putative Collective Action Members are similarly situated to Burns, and to one another, within the meaning of Section 216(b) of the FLSA.

112.    The time period relevant to the claims of the FLSA Wage Theft Putative Collective Action Members is, on information and belief, February 2015 to April 2015. However, should discovery reveal a different relevant time period, Burns reserves the right to re-define the relevant time period pursuant to an amended complaint and/or class motion.

113.    Where, as here, the employer's actions or policies were effectuated on a companywide basis, notice may be sent to all similarly situated persons on a companywide basis. *See Ryan*, 497 F. Supp. 2d at 825; *Jones,* 281 F.R.D. at 290.

114.    Burns reserve the right to establish sub-classes and/or modify class notice language as appropriate in any collective action certification motion or other proceeding relative to the FLSA Wage Theft Putative Collective Action Members.

115.    Burns further reserve the right to amend the definition of the FLSA Wage Theft Putative Collective Action Members, or establish sub classes if discovery and further investigation reveal that the putative class should be expanded or otherwise modified.

## VII.    TEXAS STATE LAW WAGE THEFT CLAIM CLASS ALLEGATIONS

116.    Plaintiffs incorporate the preceding paragraphs by reference as if set forth fully in this section.

117.    As common law employees under Texas Law, Burns and the State Law Wage Theft Class Members seek recovery of all straight time wages owed by Chesapeake, Wild Purge and/or the John Doe Defendants for the Texas State Law Wage Theft Claim.

118.    Alternatively, Burns and the State Law Wage Theft Class Members seek recovery of all straight time wages and other damages owed by Chesapeake, Wild Purge and/or the John Doe Defendants for the Texas State Law Wage Theft Claim under the Texas law principles of quantum meruit and/or money had and money received.

119.    Burns brings this Texas State Law Wage Theft Claim action on behalf of himself and State Law Wage Theft Class Members. Burns seeks to represent a class initially defined as: "all pumpers and/or gaugers who (a) worked exclusively for Chesapeake, with Chesapeake's knowledge of that work, during the time period of approximately February 2015 to April 2015; (b) timely submitted invoices for that work to Wild Purge; (c) expected to be paid a day rate for that work performed for Chesapeake; (d) but were not paid any wages for several workweeks worked in that time period by Chesapeake, Wild Purge, and/or the John Doe Defendants." Burns

requests the opportunity to expand, narrow, or modify the State Law Wage Theft Class Member class definition, including sub-classes, pursuant to a motion for class certification and/or amended complaint.

120.    Burns' and State Law Wage Theft Class Members claims satisfy the numerosity, commonality, typicality, adequacy and superiority requirements of a class action. On information and belief, there over 100 other workers who are and/or were victims of the Texas State Law Wage Theft Claim. As such, joinder is impracticable. The precise number of Texas State Law Wage Theft Claim class members and their addresses are readily determinable from the records of Chesapeake, Wild Purge and/or the John Doe Defendants.

121.    There are common questions of fact and law as to the class that predominate over any questions affecting only individual class members. The questions of law and fact common to the class arising from the Texas State Law Wage Theft Claim include, but are not limited to, the following:

> a. Whether Burns and the State Law Wage Theft Class Members are and/or were common law employees Chesapeake, Wild Purge and/or the John Doe Defendants;
>
> b. Whether Burns and the State Law Wage Theft Class Members are entitled to recovery of unpaid straight wages and other damages from Chesapeake, Wild Purge and/or the John Doe Defendants pursuant to Texas state law claims premised on quantum meruit and/or money had and money received; and
>
> c. The appropriate method to calculate damages owed Burns and the State Law Wage Theft Class Members by Chesapeake, Wild Purge and/or the John Doe Defendants for violations of state law in connection with the Texas State Law Wage Theft Claim.

122.    The questions above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy,

efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of the Texas State Law Wage Theft Claim.

123.    A class action is the superior method for the fair and efficient adjudication of this controversy. Chesapeake, Wild Purge and/or the John Doe Defendants have acted or refused to act on grounds generally applicable to the class. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of class members to protect their interests.

124.    Burns is victim of the Texas State Law Wage Theft Claim and is therefore a member of the Texas State Law Wage Theft Class. Burns is committed to pursuing this action and has retained counsel with extensive experience in prosecuting complex wage, employment, and class action litigation. Accordingly, Burns is an adequate representative of the class and has the same interests as all of its members. Furthermore, Burns' claims are typical of the claims of all members of the class, and Burns will fairly and adequately protect the interests of the absent members of the class. Burns and his counsel do not have claims or interests that are adverse to the class members.

125.    Burns reserves the right to establish sub-classes and/or modify class notice language as appropriate in any class action certification motion or other proceeding.

126.    Burns further reserve the right to amend the definition of the putative class, or sub classes therein, if discovery and further investigation reveal that the putative class should be expanded or otherwise modified.

## VIII.    JURY DEMAND

127.    Plaintiffs demand a jury trial.

## IX.    **DAMAGES AND PRAYER**

128.    Plaintiffs ask that the Court issue a summons for Defendants to appear and answer, and that Plaintiffs and the collective action and class action members be awarded a judgment against Chesapeake, Wild Purge and/or the John Doe Defendants for the following:

a. Certification of Plaintiffs' FLSA Independent Contractor Misclassification Overtime Claims as a collective action with the requirement of notice of this lawsuit being provided to the putative collective action members;

b. Certification of Burns' Wage Theft FLSA Overtime and Minimum Wage Claims as a collective action with the requirement of notice of this lawsuit being provided to the putative collective action members;

c. Actual damages in the amount of unpaid overtime wages;

d. Actual damages in the amount of unpaid minimum wages;

e. Liquidated damages in an equal amount to unpaid overtime wages and/or minimum wages;

f. Post-judgment interest on the FLSA damages;

g. Costs;

h. Reasonable attorney's/attorneys' fees;

i. Certification of Burns' Texas State Law Wage Theft Claims as a Rule 23 class action naming Burns as the class representatives and the undersigned as class counsel;

j. All available damages for the Texas State Law Claims including pre-and post-judgment interest; and

k.  All other relief to which Plaintiff(s) and the putative collective action members and/or putative class action members are justly entitled.

Date: November 18, 2015.

Respectfully submitted,


By:     s/ Allen Vaught
        Allen R. Vaught
        TX Bar No. 24004966
        MS Bar No. 101695
        avaught@baronbudd.com
        Baron & Budd, P.C.
        3102 Oak Lawn Avenue, Suite 1100
        Dallas, Texas  75219
        (214) 521-3605 – Telephone
        (214) 520-1181 – Facsimile

        Glenn D. Levy
        Texas Bar No. 12264925
        Law Offices of Glenn D. Levy
        906 Basse, Suite 100
        San Antonio, Texas 78212
        Telephone: (210) 822-5666
        Facsimile: (210) 822-5650
        glenn@glennlevylaw.com

        ATTORNEYS FOR PLAINTIFFS