# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CHAD BURNS AND DAVID TORRES,** | § | |
| **On Behalf of Themselves and All Others** | § | |
| **Similarly Situated,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. SA-15-CV-1016-RP** |
| | § | |
| **CHESAPEAKE ENERGY, INC., et al.,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER CONDITIONALLY CERTIFYING COLLECTIVE ACTION AND CERTIFYING CLASS ACTION

This Order concerns Plaintiffs' Motion for Conditional Certification of a Collective Action and to Issue Notice with Brief in Support [#45] and Plaintiffs' Motion for Rule 23 Class Action Certification [#47]. Also before the Court are Plaintiffs' Appendix in Support of Plaintiffs' Motion for Conditional Certification of a Collective Action [#46], Chesapeake Energy Corporation's and Chesapeake Operating L.L.C.'s Response to Plaintiffs' Motion for Conditional Certification of a Collective Action and to Issue Notice [#51], Plaintiffs' Reply in Support of Plaintiffs' Motion to Conditionally Certify a Collective Action and to Issue Notice [#59], Plaintiffs' Appendix in Support of Plaintiffs' Reply in Support of Motion for Conditional Certification of a Collective Action and to Issue Notice [#60], and Plaintiffs' Appendix in Support of Plaintiffs' Motion for Rule 23 Class Action Certification [#48].

The motions were referred to the undersigned for disposition pursuant to Federal Rule of Civil Procedure 72 and Rules CV-72 and 1(c) of Appendix C of the Local Rules of the United

States District Court for the Western District of Texas [#64].[1]  The undersigned has authority to enter this order pursuant to 28 U.S.C. § 636(b)(1)(A).  For the reasons set forth below, Plaintiffs' Motion for Conditional Certification of a Collective Action and to Issue Notice with Brief in Support [#45] and Plaintiffs' Motion for Rule 23 Class Action Certification [#47] are **GRANTED IN PART** to the extent set forth herein.

## I. Background

Plaintiffs Chad Burns and David Torres bring this action on behalf of themselves and all others similarly situated against Defendants Chesapeake Energy Corporation and Chesapeake Operating, L.L.C. (collectively "Chesapeake"), Wild Purge I, LLC ("Wild Purge"), and John Doe Defendants 1 to 5 ("John Doe Defendants").  Plaintiffs seek unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the federal Portal-to-Portal Act, 29 U.S.C. §§ 251–262, as well as unpaid straight-time wages under Texas law.

According to Plaintiffs' Amended Complaint, Plaintiffs worked for Chesapeake, one of the largest oil and natural gas companies in the United States, as oilfield workers performing "pumper" and/or "gauger" related job duties in connection with Chesapeake's oilfield operations in and around the Eagle Ford Shale area of South Texas.  (Am. Compl. [#9] ¶¶ 1, 55.)  Plaintiffs claim that pumpers and gaugers have job duties which typically include driving to various wellsites to check, maintain, and if possible, repair, pump jacks, tank batteries, compressors, motors, and other oil and natural gas production field equipment.  (Am. Compl. [#9] ¶ 60.)  Pumpers and gaugers also are responsible for providing reports to Chesapeake regarding the

---

[1] The motions were initially referred to Magistrate Judge Pamela Mathy on November 28, 2016 [#64], but were administratively reassigned to the undersigned's docket on January 18, 2017, upon Judge Mathy's retirement.

status of field equipment, including alerting Chesapeake to equipment in need of replacement. (Am. Compl. [#9] ¶ 60.)

Plaintiffs claim that, throughout their employment, Chesapeake used Wild Purge as its workforce staffing and third-party payor company. (Am. Compl. [#9] ¶ 56.). According to Plaintiffs, Wild Purge provided Chesapeake with workforce personnel and issued Chesapeake's workers their paychecks in connection with their work. (Am. Compl. [#9] ¶ 56.) Plaintiffs allege that they would complete work as scheduled by Chesapeake, submit invoices summarizing days worked to Wild Purge, and would then receive a paycheck from Wild Purge. (Am. Compl. [#9] ¶¶ 1, 59.) Plaintiffs were paid a day rate for their work, and Wild Purge received a percentage of that day rate pay from Chesapeake in connection with issuing the paychecks to Plaintiffs. (Am. Compl. [#9] ¶ 1, 76.) Plaintiffs allege that Chesapeake and Wild Purge acted as their joint employers during this time period but that Chesapeake and/or Wild Purge misclassified Plaintiffs as independent contractors. (Am. Compl. [#9] ¶ 2.)

The allegations raised in this lawsuit are twofold: (1) Plaintiffs regularly worked in excess of 40 hours in a given workweek but never received overtime compensation; and (2) in approximately the first quarter of 2015, Wild Purge ceased paying Plaintiffs altogether in connection with Plaintiffs' work for Chesapeake, despite the fact that they timely submitted invoices to Wild Purge for work completed. (Am. Compl. [#9] ¶¶ 104–26.) Plaintiffs seek unpaid overtime premium payments pursuant to the FLSA ("FLSA claims") and seek unpaid straight-time wages under an equitable theory of *quantum meruit* under Texas law ("wage-theft claims"). (Am. Compl. [#9] ¶¶ 90, 98, 117, 118.) Plaintiffs claim that Chesapeake and Wild Purge are jointly and severally liable for the damages sought in this lawsuit. (Am. Compl. [#9] ¶ 2.) Plaintiffs add the John Doe Defendants to this suit in order to address any unknown

successor companies who are or may be liable to Plaintiffs. (Am. Compl. [#9] ¶ 8.) Chesapeake has filed an Answer in this action [#13], but Wild Purge has not made an appearance. The Clerk entered an Entry of Default against Wild Purge on May 24, 2016 [#23]. Plaintiffs' motion for default judgment against Wild Purge remains pending [#38].

Plaintiffs now move to conditionally certify their FLSA claims as a collective action pursuant to Section 216(b) of the FLSA [#45]. In a separate motion [#47], Plaintiffs also move to certify their straight-time claims as a class action pursuant to Federal Rule of Civil Procedure 23.

The Court has subject-matter jurisdiction over this case based on federal-question jurisdiction, because Plaintiffs base their claims on federal law, the FLSA. *See* 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367, as the facts relative to those claims form part of the same case or controversy as the claims arising under the FLSA.

## II. Analysis

### A. FLSA Collective Action

#### i. Certification Standard

The FLSA requires covered employers to pay non-exempt employees for hours worked in excess of defined maximum hours, 29 U.S.C. § 207(a), and allows employees to sue their employers for violation of its wage and hour provisions. See 29 U.S.C. §§ 215–16. An employee may sue his employer under the FLSA on "behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). However, unlike Rule 23 class actions, collective actions proceed on an "opt in" rather than an "opt-out" basis. *Tolentino v. C & J Spec-Rent Servs., Inc.,* 716 F. Supp. 2d 642, 646 (S.D. Tex. 2010); *see also* 29 U.S.C. § 216(b) ("No

employee shall be a party plaintiff to any such action unless he gives his consent in writing to become a party and such consent is filed in the court in which such action is brought."). District courts have discretion to decide whether and how to issue notice for putative plaintiffs to opt-in to a FLSA collective action and to modify the proposed class if it is overly broad. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989); *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931–32 (5th Cir. 2005).

In this circuit, there are two approaches used to guide a court's decision to certify a collective action: the *Lusardi* approach and the *Shushan* approach. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995), *overruled in part on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *see also Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987); *Shushan v. Univ. of Colo.*, 132 F.R.D. 263 (D. Colo. 1990). The *Shushan* approach embraces the Rule 23 procedure for certifying class actions, whereas the *Lusardi* approach uses a two-step process to determine whether employees are similarly situated under the FLSA. *See Mooney*, 54 F.3d at 1213–14. Most courts in this Circuit apply the *Lusardi* approach, and the Court will do so here. *See Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 915 n.2 (5th Cir. 2008); *Tolentino*, 716 F. Supp. 2d at 646 (collecting cases).

The *Lusardi* analysis involves two stages: (1) the notice stage and (2) the decertification stage. *See Sandoz*, 553 F.3d at 915 n.2. At the notice stage, the court reviews the pleadings and any affidavits that have been submitted to determine whether to conditionally certify the class and to give notice to potential class members. *Hernandez v. Robert Dering Constr., LLC*, 191 F. Supp. 3d 675, 680 (S.D. Tex. 2016). A court is not to consider the ultimate merits of a given cause of action in making a decision on certification. *Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 465 (S.D. Tex. 2012).

The standard at the notice stage is a "lenient" one. *Mooney*, 54 F.3d at 1214. A plaintiff need only make "substantial allegations that the putative class members were together the victims of a single decision, policy or plan." *Id.* & n.8 (citations omitted). In making this determination, courts also consider such factors as whether "(1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt into the lawsuit." *Tolentino*, 716 F. Supp. 2d at 647 (internal citations omitted). The remedial nature of the FLSA "militate[s] strongly in favor of allowing cases to proceed collectively." *Id.* After conditional certification the "putative class members are given notice and the opportunity to 'opt-in.'" *Mooney,* 54 F.3d at 1214.

After the opt-in period has concluded and discovery is largely complete, the defendant may file a motion to decertify the collective action. *Hernandez*, 191 F. Supp. 3d at 680. At this stage, the court makes a final factual determination on the similarly situated question, and the court may decertify the class and dismiss the opt-in plaintiffs without prejudice. *Mooney*, 54 F.3d at 1214.

Plaintiffs seek to certify a class of "all current and former monitors, pumpers, gaugers, and well-maintenance workers" who worked for Chesapeake, were classified as independent contractors, were paid on a day-rate basis by Wild Purge, worked more than forty hours in any workweek in the time period relevant to this suit, and were not paid corresponding overtime compensation. (Pls.' Mot. Cond. Cert. [#45] at 7.) Plaintiffs argue that they have made substantial allegations under 29 U.S.C. § 207 that they were not paid overtime compensation due to their misclassification as independent contractors; that they and the putative collective-action

members are "similarly situated" with respect to their job requirements and pay provisions; and that other plaintiffs desire to opt-in to this litigation. (Pls.' Mot. Cond. Cert. [#45] at 6, 7, 9.)

Chesapeake asks the Court to deny Plaintiffs' motion, arguing that the putative class is comprised of individuals who were not similarly situated because they engaged in "markedly different functions"; Plaintiffs have not substantiated their allegations that Defendants acted as their joint employer; and Chesapeake did not maintain any employment records for Plaintiffs, and thus Chesapeake is incapable of providing the relief Plaintiffs seek—the production of Plaintiffs' names and contact information. (Chesapeake's Resp. [#51] at 1–2, 7–8.)

Having reviewed the pleadings, declarations of Plaintiffs Chad Burns and Oscar Escalante and attached exhibits, as well as the affidavits and exhibits submitted by Chesapeake, the Court finds that Plaintiffs have satisfied the relatively "lenient" standard for certification under *Lusardi*. *See Mooney*, 54 F.3d at 1214.

ii.      Plaintiffs are "similarly situated" for purposes of the FLSA.

At the notice stage, Plaintiffs need only make a "modest factual showing" that they are "similarly situated" to the other employees named in the proposed class. *Vargas v. HEB Grocery Co., LP*, No. SA-12-CV-116-XR, 2012 WL 4098996, at *2 (W.D. Tex. Sept. 17, 2012) (citing *Realite v. Ark Rests. Corp.*, 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998)); *see also Pedigo v. 3003 S. Lamar, LLP*, 666 F. Supp. 2d 693, 698 (W.D. Tex. 2009). Additionally, Plaintiffs need only be similarly situated "in relevant respects given the claims and defenses asserted." *Tolentino*, 716 F. Supp. 2d at 647. In wage and hour cases, this means the proposed class must be "similarly situated in terms of job requirement and similarly situated in terms of payment provisions." *Mathis v. Stuart Petroleum Testers, Inc.*, No. 5:16-CV-094-RP, 2016 WL 4533271, at *2 (W.D. Tex. Aug. 29, 2016) (citing *Pedigo*, 666 F. Supp. 2d at 698). Thus, the relevant

inquiry for the court is whether the proposed class members "performed the same basic tasks as part of their employment and were subject to the same pay decisions, policies, or practices." *Id.* (citing *Tice v. AOC Senior Home Health Corp.*, 826 F. Supp. 2d 990, 996 (E.D. Tex. 2011). Employees need not be "similarly situated in each and every aspect of their employment," but rather there must be simply "some identifiable facts or legal nexus" binding together the claims "so that hearing the cases together promotes judicial efficiency." *Id.* (internal quotations omitted).

Plaintiffs have demonstrated that they are similarly situated both as to their job requirements and their payment provisions. *See Pedigo*, 666 F. Supp. 2d at 698. The crux of Plaintiffs' allegations is that the putative class of "monitors, pumpers, gaugers, and well-maintenance workers" was subject to a single policy of discrimination established by Chesapeake to avoid paying overtime compensation, unemployment insurance, health insurance, retirement benefits, and other employer obligations. Plaintiffs allege that they are full-time workers who performed work exclusively for Chesapeake but were improperly classified as independent contractors. Plaintiffs claim they regularly worked in excess of 40 hours per workweek but were not paid corresponding overtime compensation.

To support these allegations, Plaintiffs provide the declarations of two Plaintiffs, Chad Burns and Oscar Escalante, both of whom testified to being subject to these pay practices. (Burns Decl. [#45-1] ¶¶ 1–2 ("I worked for Chesapeake . . . [and] was paid on a day rate basis"), 9–10 (was labeled "as an independent contractor," was paid "pursuant to an IRS form 1099 by Wild Purge" and "was never paid any overtime pay"), 16 ("I regularly worked more than 12 hours per work day and more than 40 hours per workweek"); Escalante Decl. [#45-2] ¶¶ 1–2 ("I worked full time for Chesapeake, [but] Chesapeake and Wild Purge labeled me as an

independent contractor" [and] "I was paid on a day rate basis", 8–11 (I did not "ever receive overtime pay despite routinely working over 40 hours in a seven day workweek").)  Both Burns and Escalante also testified that they have personal knowledge of other workers who performed monitor, pumper, gauger, and well-maintenance work for Chesapeake who were subject to the same pay practices and who also never received overtime compensation for hours worked in excess of 40 per workweek.  (Burns Decl. [#45-1] ¶¶ 32–34; Escalante Decl. [#45-2] ¶¶ 31–32.)  As additional evidence of these pay practices, Burns and Escalante have submitted sample invoices to the Court that were issued to Wild Purge for work performed by Plaintiffs, that to do not reflect the hours worked in a work day or workweek and instead reflect a single day rate.  (Burns Decl. [#46-1] Ex. 1 at 12, 18–19; Escalante Decl. [#46-2] Ex. 1 at 34–37.)  Plaintiffs also provided the Court with a list of other Chesapeake workers paid by Wild Purge they believe were subject to the same pay practices.  (Burns Decl. [#46-1] Ex. 1 at 12, 18–19; Escalante Decl. [#46-2] Ex. 1 at 34–37.)  These allegations, declarations, and exhibits are adequate to satisfy Plaintiffs' burden that they come forth with "substantial allegations that potential [class] members 'were together victims of a single decision, policy, or plan.'"  *McKnight v. Houston, Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010) (citing *Sperling v. Hoffmann–La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988).

Plaintiffs also have demonstrated that the putative class is "similarly situated" with respect to their job requirements.  The proposed class consists of all former and current "monitors, pumpers, gaugers, and well-maintenance workers."  It is well established that "similarly situated" need not mean "identical" for purposes of conditional certification.  *See Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 468 (S.D. Tex. 2012) (quoting *Jesiek v. Fire Pros, Inc.*, 275 F.R.D. 242, 246 (W.D. Mich. 2011)).  Moreover, the fact that the proposed class

encompasses different job titles does not preclude a finding that Plaintiffs are similarly situated, particularly at this preliminary stage in the litigation. *See, e.g.*, *Walker v. Honghua Am.*, LLC, 870 F. Supp. 2d 462, 470 (S.D. Tex. 2012) (concluding that Crane Operators and Roughneck/Riggers were similarly situated, as they both worked at the same facility and were subject to a policy of not being paid overtime, even though one position focused on operating cranes and the other disassembling drill rigs). This is particularly true where the division between positions is "porous," such that employees move fluidly between different employee categories as needed. *See id.* at 469 (citing *Jesiek*, 275 F.R.D. at 247).

In his declaration, Burn testifies that throughout his time with Chesapeake he worked as a well monitor, night pumper, and lead pumper. (Burns Decl. [#45-1] ¶ 3.) According to Burns, his job duties in these positions required him to make field visits to various Chesapeake worksites throughout the Eagle Ford Shale region in order to inspect, monitor, and repair oilfield-related equipment, such as pump jacks, compressors, tank batteries, and other oil and gas production equipment. (Burns Decl. [#45-1] ¶ 3, 4, 8.) For example, as a well monitor, Burns states he was required to visit sites day and night for safety maintenance, such as "ensur[ing] that wells that had been shut down during the day were achieving the proper pressure levels before being turned back on." (Burns Decl. [#45-1] ¶ 4.) Similarly, as a night pumper, Burns testifies that he was part of a dispatch team that would monitor all automated well sites and respond to arising maintenance needs. (Burns Decl. [#45-1] ¶ 5.) As lead night pumper, Burns's responsibilities were similar, such as ensuring that "high priority well sites were operational and repaired," with the additional responsibility of completing reports for the supervisor of night-pumping operations. (Burns Decl. [#45-1] ¶ 6.) Regardless of his job title, Burns states that a primary aspect of his work concerned $H_2S$ gas levels, particularly ensuring that "$H_2S$ gas levels

never reached dangerous levels."[2]  (Burns Decl. [#45-1] ¶¶ 4, 6–7.)  Escalante's declaration indicates that he also began his employment with Chesapeake as a well monitor, and then was promoted to production supervisor.[3]  (Escalante Decl. [#45-2] ¶ 2.)  As a well monitor, Escalante testified that he had the same job duties as Burns, essentially monitoring, inspecting, and repairing oilfield equipment, with a focus on $H_2S$ gas safety.  (Escalante Decl. [#45-2] ¶ 4.)

In summary, the declarations of Burns and Escalante indicate that their job requirements were to work at oil and gas sites owned and operated by Chesapeake, drive to various well sites to check and maintain oilfield equipment, and if possible, to repair non-operational equipment, essentially performing "general maintenance of well sites."  (Burns Decl. [#45-1] ¶¶ 3, 4, 8.)  The Court is not persuaded by Chesapeake's argument that pumpers and monitors are "markedly dissimilar," because monitors "monitor oil wells" to ensure proper pressure and gas levels while pumpers "were responsible for general maintenance on the wells."  (Chesapeake Resp. [#51] at 9–10.)  Rather, Plaintiffs' declarations describe overlapping duties all involving maintenance and repair duties on oil wells and related equipment.  Furthermore, Burns testifies that the job duties

_____

[2] $H_2S$ stands for hydrogen sulfide, a common and dangerous gas present in oil and gas exploration and production operations.  According to Burns, even short unprotected exposure to this gas can be deadly.  (Burns Decl. [#45-1] ¶ 4.)

[3] As a production supervisor, Escalante describes his responsibilities as signing, on behalf of Chesapeake, vendor, water, safety-team, hot-oil company, and water-hauling company invoices (Escalante Decl. [#45-2] ¶ 5.)  He also states he was "in charge of ensuring that all tasks were completed without any interruption at different oil sites," as well as flushing out wells and hot oil equipment and other preventative maintenance measures.  (Escalante Decl. [#45-2] ¶ 5.)  Chesapeake takes issue with Escalante's job duties, claiming that his supervisory responsibilities were markedly dissimilar from those held by monitors and pumpers and other front-line employees as described by Plaintiffs.  (Chesapeake Resp. [#51] at 10.)  The Court agrees with Chesapeake it is likely that Escalante, when acting as a production supervisor, was not similarly situated to the proposed class.  However, Plaintiffs do not seek to conditionally certify a class of "production supervisors."  The proposed class includes only "monitors, pumpers, gaugers, and well maintenance workers."  Escalante alleges that at times he acted as a well monitor for Chesapeake; therefore, he falls into the proposed class for the time period in which he held that position.

he describes were typical of all Chesapeake employees who worked as monitor, pumper, gauger, or well-maintenance workers in the Eagle Ford Shale area and that these job titles were fluid and interchangeable, as Plaintiffs often switched job duties on a daily basis at Chesapeake's direction. (Defs.' Reply [#59] at 4; Burns Decl. [#46-1] ¶ 8 & Ex. 2 at 13-18.) Escalante similarly testified that he was hired "to continuously monitor, pump, gauge, and maintain oilfield related equipment vital to Chesapeake's ongoing oilfield operations." (Escalante Decl. [#46-2] ¶ 31.) These allegations and supporting documentation convince the Court that Plaintiffs, when acting as monitors, pumpers, gaugers, and well maintenance workers, were similarly situated for purposes of conditionally certifying this case as a collective action.[4]

Finally, the Court disagrees with Chesapeake's characterization of the facts and allegations in this case as "nearly identical" to *Mathis v. Stuart Petroleum Testers, Inc.*, No. 5:16-CV-094-RP, 2016 WL 4533271 (W.D. Tex. Aug. 29, 2016). In *Mathis*, the Court denied conditional certification of a proposed class of all "former and current Pump Supervisors and/or

---

[4] Chesapeake also faults Plaintiffs for including in the proposed class the positions of gaugers and well-maintenance workers, as neither Burns nor Escalante appear to have held these positions and thus cannot testify directly to the responsibilities and duties involved. (Chesapeake Resp. [#51] at 9.) The Court is not persuaded that this precludes the inclusion of these positions in the proposed class. Burns testified that based on his personal experience and observations the duties of gaugers and well-maintenance workers are essentially the same as the pumpers and well monitors. (Burns Decl. [#46-1] at 3.) Moreover, a proposed class need only be similarly situated "in relevant respects given the claims and defenses asserted." *Tolentino*, 716 F. Supp. 2d at 647. Plaintiffs claim they were misclassified as independent contractors. Chesapeake's primary defense is that it was not Plaintiffs' employer. (Defs.' Answer [#13] at 13.) The determinative issues in evaluating whether a worker is properly classified as an independent contractor do not center on the primary duties of a specific job title, as in cases that turn on whether or not one of the FLSA exemptions applies. In light of the claim asserted by Plaintiffs here, Chesapeake's payment arrangement with Plaintiffs and its degree of control over Plaintiffs is far more relevant for purposes of the similarly-situated inquiry. *See Andel v. Patterson–UTI Drilling Co.*, LLC, 280 F.R.D. 287, 290 (S.D. Tex. 2012) (setting forth five-factor test for independent contractors); *see also infra* at Section II.A.iv. If discovery reveals that the gaugers and well-maintenance workers are markedly dissimilar to Plaintiffs in relevant respects, Chesapeake may move for decertification at a later stage in the litigation. *See Mooney*, 54 F.3d at 1213–14.

Field Supervisors (or similar positions)." 2016 WL 4533271, at *2. The Court found Plaintiffs'
description of the job duties to be "too vague for the Court to determine that other employees in
the same positions perform the same basic tasks" and denied conditional certification without
prejudice to refile a motion for certification with more factual detail. *Id.* at *2–4. Yet in *Mathis*,
the declaration of the representative plaintiff contained virtually no factual description
whatsoever of the work of the proposed class, merely describing his primary duties as "manual
labor" related to "maintain[ing] and operat[ing] the equipment used at the oilfield well sites." *Id.*
at *2. The Court in *Mathis* appropriately reasoned that this description was so broad as to
virtually include any worker "performing some manual labor at a well site." *Id.* In contrast,
Plaintiffs have submitted detailed declarations and supporting exhibits, invoices, and reports
issued to and from Chesapeake, totaling almost 40 pages, that describe the work of a well
monitor, pumper, gauger, or well-maintenance worker as involving inspecting, monitoring, and
repairing equipment such as pump jacks, compressors, and tank batteries. (Burns Decl. [#45-1] ¶
3, 4, 8.) Plaintiffs also provide the Court with substantial testimony regarding the important
safety-related work that the proposed class performed related to $H_2S$ gas levels. (Burns Decl.
[#45-1] ¶¶ 4, 6–7.) This detail stands in direct contrast to the deficiencies identified by the court
in *Mathis*. *Cf.* 2016 WL 4533271, at *2 ("[Plaintiff] does not, for example, explain what
equipment a pump supervisor or field supervisor would regularly use, what other types of
employees they would work with, or what specific tasks they would perform.")

In summary, Plaintiffs have made the "modest factual showing" required that they are
similarly situated at this preliminary stage of the litigation. *See Vargas*, 2012 WL 4098996, at
*2. If at any point during discovery it becomes apparent that Plaintiffs' job requirements and

pay provisions are indeed significantly dissimilar, Chesapeake can file a motion to decertify the conditional class. *See Hernandez*, 191 F. Supp. 3d at 680.

### iii.     Plaintiffs have sufficiently demonstrated that aggrieved individuals exist who want to opt-in to this lawsuit.

In addition to demonstrating that there is a proposed class of similarly situated employees, a representative plaintiff must demonstrate that there is a reasonable basis for crediting the assertion that aggrieved individuals exist and those individuals want to opt-in to the lawsuit.[5] *Tolentino*, 716 F. Supp. 2d at 647 (internal citations omitted). Since the filing of this lawsuit in November 2015 by Burns and the Plaintiff David Torres, nine additional Plaintiffs have already consented to join this suit. (Pls.' Mot. Cond. Cert. [#45] at 9; *see also* Notice of Consent to Join [#8, 10, 15, 16, 19, 26, 35, 57]. Additionally, Plaintiffs have presented the Court with a list of over 100 workers who worked for Chesapeake but were paid by Wild Purge who are potential opt-in Plaintiffs in this suit. (Burns Decl. [#46-1] Ex. 4 at 22–24). Plaintiffs have met their burden of showing there are other aggrieved individuals who exist to opt-in to this suit.

### iv.     Plaintiffs have sufficiently alleged that Chesapeake was their "joint employer" for purposes of conditional certification.

Chesapeake argues that conditional certification should also be denied because Plaintiffs have failed to substantiate their allegations of joint employment. Chesapeake argues that in independent-contractor cases, such as this one, this Court should apply the "economic reality" test to evaluate whether there is an employer/employee relationship under the FLSA before certifying this collective action and cites to the four-factor test for employee status under the

---

[5] The Court notes that not all courts require a showing that other aggrieved individuals desire to join the suit. *See Dreyer v. Baker Hughes Oilfield Operations, Inc.*, No. CIV.A. H-08-1212, 2008 WL 5204149, at *3 (S.D. Tex. Dec. 11, 2008) (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)) ("such a requirement is at odds with the Supreme Court's command that the FLSA be liberally construed to effect its purposes").

FLSA. *See Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010). (Chesapeake Resp. [#51] at 12–13.) Plaintiffs argue that Chesapeake has set forth the incorrect test to determine whether a worker is an employee or an independent contractor, urging the Court to instead apply the "economic realities" test, which is the five-factor test set forth in *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). (Pls.' Reply [#59] at 9.)

Plaintiffs are correct that, to determine whether an employer has properly classified a worker as an independent contractor, courts in this circuit "generally use as a guide five, non-exclusive factors: (a) the permanency of the relationship; (b) the degree of control exercised by the alleged employer; (c) the skill and initiative required to perform the job; (d) the extent of the relative investments of the worker and the alleged employer; and (e) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer." *Andel v. Patterson–UTI Drilling Co.*, LLC, 280 F.R.D. 287, 290 (S.D. Tex. 2012) (quoting *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 846 (5th Cir. 2010)). However, some courts do borrow from the general test for employee status cited by Chesapeake to consider generally whether the defendant "controls" or "supervises" class members in a similar manner in determining whether the proposed class is similarly situated for purposes of conditional certification. *See, e.g.*, *Scott v. Bimbo Bakeries, USA, Inc.*, No. CIV.A. 10-3154, 2012 WL 645905, at *7 (E.D. Pa. Feb. 29, 2012), *abrogation on other grounds recognized by Razak v. Uber Techs., Inc.*, No. CV 16-573, 2016 WL 5874822, at *9 (E.D. Pa. Oct. 7, 2016). Still other courts are of the opinion that the economic-realities test should not be utilized at all when determining whether to conditionally certify an FLSA action concerning an allegedly wrongful independent-contractor designation, because it is a merits-based determination. *See Walker*, 870 F. Supp. 2d at 470–71 (collecting cases); *see also Putnam v. Galaxy 1 Marketing, Inc.*, 276

F.R.D. 264, 274 (S.D. Iowa 2011) ("Making a determination, at this time, of whether the satellite installation technicians were independent contractors or employees pursuant to the 'economic realities' test, would also improperly delve into the merits of Plaintiffs' claim."); *Lemus v. Burnham Painting and Drywall Corp.*, No. 2:06–cv–01158–RCJ–PAL, 2007 WL 1875539, at *5 (D. Nev. June 25, 2007) ("The fact intensive inquiries concerning whether the plaintiffs are independent contractors or employees for the purposes of the FLSA . . . [is] more appropriately decided after notice has been given, the deadline to opt in has passed, and discovery has closed.").

This Court is in accord with *Walker*, 870 F. Supp. 2d at 471 and others in finding that a complete analysis and determination regarding the economic-realities test is not appropriate at the first stage of FLSA certification. Even if the test applies, however, the Court finds Plaintiffs have presented sufficient evidence that they are similarly situated under the five factors within the respective positions of monitor, pumper, gauger, and well-maintenance workers.

Specifically, Plaintiffs have submitted sworn testimony to the Court that they were hired by Chesapeake as full-time workers for an indefinite period of time; they worked exclusively for Chesapeake for the period relevant to this suit; thy used Chesapeake supplies and equipment, aside from a few minor tools and work clothes; and they worked exclusively on Chesapeake oilfield operation sites. (Burns Decl. [#46-1] Ex. A ¶ 9–10.) Plaintiffs further testified they were "economically dependent on Chesapeake" and Chesapeake "scheduled and controlled" the manner in which Plaintiffs performed their job. (Burns Decl. [#46-1] Ex. A ¶¶ 19–32.) The Court finds that the testimony of Plaintiffs is adequate at this preliminary stage in the litigation to support their allegations that they were employees of Chesapeake. *See Andel*, 280 F.R.D. at 290.

Additionally, insofar as is necessary at the conditional certification stage, the Court also finds that Plaintiffs have sufficiently alleged that Chesapeake and Wild Purge were their "joint employers." A joint employer is shown where the employee "performs work which simultaneously benefits two or more employers." *Nieddu v. Lifetime Fitness, Inc.*, 38 F. Supp. 3d 849, 860 n.6 (S.D. Tex. 2014) (citing 29 C.F.R. § 791.2(b)). In light of all the evidence before the Court, Chesapeake cannot genuinely argue that it did not benefit from the work of the proposed class.

v.      Request to Issue Notice

By their motion, Plaintiffs ask the Court to order Defendants to produce the names, addresses, e-mail addresses, and dates of employment of the proposed class within then days of conditionally certifying this action. (Pls.' Mot. [#45] at 10.) Plaintiffs also ask the Court to order Defendants to post the Notice and Consent forms on all Chesapeake jobsites for 90 days in an open and obvious location and to authorize Plaintiffs' counsel to send a reminder postcard and to e-mail an identical copy of the Notice and Consent form to the proposed class. (Pls.' Proposed Order [#45-1] at 2.)

Chesapeake not only opposes the form of notice requested, but also asks the Court to deny Plaintiffs' motion for conditional certification on the basis that Chesapeake is incapable of providing the names and contact information needed to issue notice. (Chesapeake [#51] at 7–8.) According to Chesapeake, it has never had custody or control of any pertinent employment information for any Wild Purge worker, making conditional certification futile. (Chesapeake [#51] at 7–8.) Chesapeake claims it does not have a list of Wild Purge workers, their contact information or their e-mail addresses, physical addresses, or Social Security Numbers and no longer does business with Wild Purge. (Kraszewski Aff. [#51-3] ¶¶ 3, 5 & Ex. A ¶ 12.)

The Court finds this argument—that Chesapeake's lack of employee records is a reason to deny conditional certification—to border on the absurd. Imagine the perverse incentive that would be created if a Court were to find that an employer could avoid a collective action in its entirety by choosing to maintain little to no record of its workers. The Court will not deny conditional certification on this basis, and Chesapeake will comply with the Court's order to whatever extent possible based on the records it does have in its possession. *See Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 455 (5th Cir. 2009) (where employer fails to keep adequate records, "[t]he solution . . . is not to penalize the employee by denying him any recovery . . . .").

As to the notice requested by Plaintiffs, Chesapeake asks the Court to substantially limit the process by limiting notice to mail delivery, denying notice posting, and refusing to allow reminder notices to potential opt-in Plaintiffs. (Chesapeake [#51] at 15–19.) The Court will not rule on the notice issue at this time. Rather, the Court will order the parties to meet and confer on the issue of notice and submit to the Court a proposed notice in hopes that some of the disputes before the Court will be reasonably resolved. If the parties successfully reach an agreement, they should jointly notify the Court of the same. If there are portions of the notice on which the parties do not agree, the parties should submit their respective positions to the Court for resolution.

The Court notes, however, that it is of the opinion that in light of Chesapeake's contention that it lacks employee records of the putative class, it is all the more important that a thorough notice process exists in this case. Furthermore, none of the methods requested by Plaintiffs are out of the ordinary under the circumstances in this case, such as the fact that the putative class is comprised of workers who disperse to non-centralized worksites throughout the

Eagle Shale Ford area both day and night. *See Jones v. Cretic Energy Servs., LLC*, 149 F. Supp. 3d 761, 775–76 (S.D. Tex. 2015) ("[P]laintiff's request[] . . . to post notice of plaintiff's lawsuit at defendant's work sites [is] not unduly burdensome or invasive, and [is] appropriate and necessary in this case because [it is] intended to further the broad remedial purposes of the FLSA by providing notice to employees whose work undisputedly requires them to travel to oilfields and stay away from home for days at a time."). Nor is there a valid reason why the parties should not agree to e-mail notice in the year 2017. *See Page v. Crescent Directional Drilling, L.P.*, No. 5:15-CV-193-RP, 2015 WL 12660425, at *3 (W.D. Tex. Dec. 10, 2015) ("Email is not the wave of the future; [it] is the wave of the last decade and a half, and it is particularly important in a case such as this one, involving field operators and technicians, who may be away from home.") (internal quotation and alteration omitted). It is the Court's hope that the parties will heed the guidance provided by the Court in this section to productively confer and agree on a reasonable notice schedule and resolve the majority of their disputes.

**B.     Rule 23 Class Action**

Plaintiffs' First Amended Complaint alleges that in approximately the first quarter of 2015 Defendants ceased paying Plaintiffs any remuneration for work they performed exclusively for Chesapeake despite Plaintiffs' submitting invoices for that work. (Am. Compl. [#9] at 3.) By this lawsuit, Plaintiffs seek these unpaid straight-time wages under an equitable theory of *quantum meruit* under Texas law. (Am. Compl. [#9] ¶¶ 90, 98, 117, 118.)

The Texas Supreme Court has defined *quantum meruit* as "an equitable remedy that is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (internal quotation marks omitted). In Texas, "[t]o recover under the doctrine of *quantum meruit*, a

plaintiff must establish that: 1) valuable services and/or materials were furnished, 2) to the party sought to be charged, 3) which were accepted by the party sought to be charged, and 4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). In addition, "[a] party generally cannot recover under *quantum meruit* when there is a valid contract covering the services or materials furnished." *In re Kellogg Brown & Root*, 166 S.W.3d at 740. "This rule not only applies when a plaintiff is seeking to recover in *quantum meruit* from the party with whom he expressly contracted, but also when a plaintiff is seeking to recover 'from a third party foreign to the original [contract] but who benefited from its performance.'" *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 462 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (quoting *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)).

Plaintiffs now seek to certify their straight-time claims as a class action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs' proposed class is a class comprised of "Plaintiffs and all affected employees of Chesapeake who worked for Chesapeake, and were paid by Wild Purge in the Eagle Ford Shale of South Texas, who have not received all straight time wages owed by Chesapeake and Wild Purge for work completed for Chesapeake relative to Chesapeake's oilfield operations." (Proposed Order [#47-1] at 1.)

Plaintiffs filed their Motion for Rule 23 Class Action Certification and Appendix in support of the motion on September 16, 2016 [#47, 48]. To date, Chesapeake has not filed a

response to the motion. Having considered Plaintiffs' motion and the evidence proffered in support thereof, the Court will grant Plaintiffs' motion to the extent stated herein.[6]

### i. Certification Standard

The purpose of class actions is to conserve "the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). "To ensure that this purpose is served, Rule 23 demands that all class actions certified under Rule 23(b)(3) meet the requirements of both 23(a): numerosity, commonality, typicality, and adequacy of representation; and 23(b)(3): predominance and superiority." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471 (5th Cir.

---

[6] Although no preemption argument has been raised by Defendants, as there is no response to Plaintiffs' motion, the Court notes that Plaintiffs' *quantum meruit* claim is not preempted by the FLSA. Numerous courts have recognized "gap time" or "straight time" claims, where the compensation sought is for hours worked in a week that are not in excess of forty and when the average wage paid is not below minimum wage. *See, e.g.*, *Karna v. BP Corp. N. Am.*, 11 F. Supp. 3d 809, 816 (S.D. Tex. 2014), *aff'd*, 609 F. App'x 814 (5th Cir. 2015); *Florida v. DLT 3 Girls, Inc.*, No. 4:11–CV–3624, 2013 WL 127448 at *5 (S.D. Tex. Jan. 9, 2013). This is precisely the kind of claim Plaintiffs allege here. "While Section 6 of the FLSA guarantees a minimum wage, it does not provide a right of action for employees to recover unpaid compensation in excess of that minimum wage." *Karna*, 11 F. Supp. 3d at 816 (citing 29 U.S.C. § 206). Consequently, courts have routinely found that such "gap time" claims are not cognizable under the FLSA and therefore not preempted by the Act. *Id.*; *see also Valcho v. Dallas Cnty. Hosp. Dist.*, 658 F. Supp. 2d 802, 811 (N.D. Tex. 2009) ("Claims for unpaid straight-time wages that do not implicate the minimum wage or overtime pay requirements are generally not cognizable under the FLSA."); *Green v. Dallas Cnty. Schs.*, No. 304CV891P, 2005 WL 1630032 at *3 (N.D. Tex. July 6, 2005) (collecting cases).

Where there is no preemption found, a plaintiff may seek certification of FLSA claims as a collective action and accompanying state-law claims as a class action in the same lawsuit. *See Calvillo v. J & M Tank Lines, Inc.*, No. SA-15-CA-1165-FB, 2016 WL 7479574, at *1 (W.D. Tex. Apr. 15, 2016), *report and recommendation adopted*, No. SA-15-CA-1165-FB, 2016 WL 7479575 (W.D. Tex. May 10, 2016) (seeking to proceed as a collective action with respect to the FLSA claim and a Rule 23 class action for the "New Mexico class" with respect to the claims under the New Mexico Minimum Wage Act); *Gonzales v. Brand Energy & Infrastructure Servs., Inc.*, No. CIV.A. H-12-1718, 2013 WL 1188136, at *1 (S.D. Tex. Mar. 20, 2013) (seeking certification to proceed with a collective action under 29 U.S.C. § 216(b) and a class action under Federal Rule of Civil Procedure 23 as to the *quantum meruit* claims).

1986).  Rule 23(a) provides that one or more members of a class may sue or be sued as representative parties on behalf of all only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical   of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  Rule 23(b) provides that an action may be maintained as a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fair and efficient adjudication of the controversy."  FED. R. CIV. P. 23(b)(3).  A district court has wide discretion in deciding whether or not to certify a proposed class.  *Jenkins*, 782 F.2d at 471–72.

> ii.     Plaintiffs have demonstrated that the proposed class is sufficiently large so as to satisfy the numerosity requirement.

With respect to numerosity, a class action is proper simply where "the class is so numerous that joinder of all members is impracticable."  FED. R. CIV. P. 23(a)(1).  "[T]here is no definite standard as to what size class satisfies Rule 23(a)(1)."  *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) (citing 7A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1762 (3d ed. 2005) (collecting cases in which numerosity was satisfied with as few as 25 putative class members, but not satisfied with as many as 350)).  For this reason, "courts must not focus on sheer numbers alone."  *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000).  Rather, assessing numerosity should entail consideration of "the geographical dispersion of the class, the ease with which class members may be identified, the

nature of the action, and the size of each plaintiff's claim." *In re TWL Corp.*, 712 F.3d at 894

(citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. Unit A July 1981)).

The Court agrees with Plaintiffs that certain factors would make joinder of this case difficult. The Court has before it a list of over 100 workers with Wild Purge e-mail addresses who are potential members of the class. (Burns Decl. [#48-1] Ex. 3 at 22–25.) According to the Declarations of Burns and Escalante, these individuals performed work for Chesapeake throughout the Eagle Ford Shale region of South Texas at disparate oilfield sites owned and maintained by Chesapeake. (Burns Decl. [#48-1] ¶¶ 3, 8; Escalante Decl. [#48-2] ¶ 2.) It follows that these same individuals likely reside at diverse locations throughout Southern Texas and spend significant periods away from their places of residence, making it difficult to identify each potential Plaintiff individually. *See In re TWL Corp.*, 712 F.3d at 894. Additionally, the fact that Wild Purge is no longer in business with Chesapeake, has not made an appearance in this action, and Chesapeake claims not to have adequate employee records makes it all the more unlikely that each individual Plaintiff could be identified. *See id.* Finally, the potential straight-time claims of each of these individuals will also likely be relatively small in comparison to the cost of litigating an individual wage and hour claim. *See id.* Accordingly, the Court finds that joinder of each and every member of the class is impractical in light of the circumstances. *See id.*

### iii. Plaintiffs have satisfied their burden to show that common questions affect the class and arise out of the same course of conduct by Defendants.

The threshold showing required for "commonality" and "typicality" is not high. *Jenkins*, 782 F.2d at 472; *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993). For commonality, Rule 23 requires only that resolution of the common questions affect all or a substantial number of the class members. *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982); FED. RULE CIV.

PROC. 23(a). Similarly, for typicality, the representative plaintiffs must merely show that their claims arise out of the same event or course of conduct as the class members' claims and are based on the same legal theory. *Durrett v. John Deere Co.*, 150 F.R.D. 555, 558 (N.D. Tex. 1993); *see also Gen. Tel. Co. of Sw.*, 457 U.S. at 156 (proposed representative must be "part of the class and possess the same interest and suffer the same injury as the class members"). "This does not mean, however, that the claims of the class representatives and those of the class must be identical." *Durrett*, 150 F.R.D. at 558 (citing *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir.1981), *cert. denied*, 456 U.S. 960 (1982)).

Here, virtually all of the factual and legal issues raised by Plaintiffs' state-law claims are common to the class except for the difference in each Plaintiff's pay rate. To prove their claim for unpaid straight time, all the Plaintiffs in the proposed class will need to demonstrate that Chesapeake received and accepted valuable services from Plaintiffs and that they expected to be paid for such work. *See Heldenfels Bros., Inc.*, 832 S.W.2d at 41 (reciting elements for a *quantum meruit* claim in Texas). This small difference in pay rate does not prevent this case from being properly certified as a class action. Each Plaintiff suffered the same type of alleged injury as Burns and Escalante: failure to be paid all wages owed for work done relative to Chesapeake's oilfield operations. Plaintiffs have demonstrated that their claims arise out of the same course of conduct, the resolution of which will affect all or a substantial number of the class members. *See Stewart*, 669 F.2d at 335; *Durrett*, 150 F.R.D. at 558.

    iv.    Plaintiffs have demonstrated that Plaintiff Chad Burns and Class Counsel Allen R. Vaught will adequately represent their interests in this litigation.

A representative plaintiff show "adequacy of representation" by demonstrating that the class representatives "fairly and adequately protect the interests of the class." FED. R. CIV. P.

23(a)(4). "Class representatives must be 'part of the class and possess the same interest and suffer the same injury as the class members." *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015). "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* (quoting *Anchem Prods. v. Windsor*, 531 U.S. 591, 625 (1997)). The adequacy of representation requirement also "raises concerns about the competency of class counsel." *Murillo v. Musegades*, 809 F. Supp. 487, 502 (W.D. Tex. 1992).

No indicators are before this Court that raise any concern with respect to the adequacy of representation in this case. The Court is not aware of any conflict of interest for the representative Plaintiff Chad Burns and Burns's Declaration makes clear that he possesses the same interest and suffered the same injury as the proposed class. *See In re Deepwater Horizon*, 785 F.3d at 1015. Burns testified in his declaration that he was not paid all or part of the straight-time wages owed to him by Defendants for work performed in 2014 and 2015 and that Defendants owe him approximately $14,000 in unpaid straight-time wages. (Burns Decl. [#48-1] ¶ 14.) The Court is convinced that Burns will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(4).

Similarly, the Declaration of Allen Vaught demonstrates that he is competent and qualified to serve as class counsel. Vaught is the managing attorney of the employment litigation department of the law firm of Baron & Budd, P.C. and has represented hundreds of Plaintiffs in class, collective, and mass action lawsuits. (Vaught Decl. [#48-3] ¶¶ 2, 5.) Vaught has been licensed as an attorney in the State of Texas for over 18 years and is in good standing to practice before each of the four federal district courts in the State of Texas, as well as numerous other federal courts. (Vaught Decl. [#48-3] ¶ 8.) The Court is not aware of any claim or interest held

by Vaught that is adverse to Plaintiffs or would raise any concerns regarding a conflict of interest. (Vaught Decl. [#48-3] ¶ 27.)

     v.    Plaintiffs have satisfied their burden to show that common questions of law and fact predominate this suit and the class-action mechanism is superior to requiring Plaintiffs to litigate their claims individually.

To demonstrate "predominance" and "superiority," a party must demonstrate both "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 325–26 (5th Cir. 2008) (citing FED. R. CIV. P. 23(b)(3)). The matters pertinent to the findings include: (A) the interests of the members of the class in individually controlling prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in management of a class action. FED. R. CIV. P. 23(b)(3).

The questions of law that will predominate as to Plaintiffs' straight-time claims are whether or not Plaintiffs were common law employees; whether there was a contract of employment between Plaintiffs and Defendants; whether Plaintiffs rendered beneficial services to Defendants; whether Defendants knowingly accepted these services; and whether Plaintiffs had a reasonable expectation to be paid by Defendants. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 740; *Heldenfels Bros., Inc.*, 832 S.W.2d at 41. These questions are common to all of the members of the proposed class. As previously noted, the only questions affecting individual members will be the differing rates of pay for their straight-time claims. Plaintiffs'

damages will be easily calculated based on the invoices they submitted to Defendants summarizing the work provided.

Additionally, the Court finds that a class action is superior to requiring the proposed class to litigate their straight-time claims individually. *See Gene And Gene LLC*, 541 F.3d at 325–26. This case is not a multi-state class action, in which variations of state law may confuse common issues. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996). Nor does it involve legal or factual differences in Plaintiffs' claims that would make litigating the issues as a class problematic for the court, difficult for the jury, or in general detract from the superiority of the class-action device in resolving Plaintiffs' claims. *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998). Finally, the Court also finds that the potential recovery of each individual Plaintiff in this case is small relative to the cost of litigating their straight-time claims. *See Castano*, 84 F.3d at 748 ("The most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit . . . ."). In summary, the Court finds that Plaintiffs have demonstrated predominance and superiority.

vi. The Court will order the parties to meet and confer on a notice schedule.

Plaintiffs ask the Court to order the parties to meet and confer regarding the substance of a proposed notice in light of the Court's decision on class certification. The Court agrees that this is the best method of determining a notice process in this collective and class action and will order the parties accordingly.

## IV. Conclusion

Having considered Plaintiffs' amended complaint, Defendants' answer, Plaintiffs' motions, as well as the parties' responses and replies (or lack thereof), Plaintiffs' Motion for Conditional Certification of a Collective Action and to Issue Notice with Brief in Support [#45]

and Plaintiffs' Motion for Rule 23 Class Action Certification [#47] are **GRANTED IN PART** as follows:

1. The Court hereby **conditionally certifies a collective action** under the Fair Labor Standards Act, 29 U.S.C. § 216, comprised of all current and former monitors, pumpers, gaugers, and well-maintenance workers who worked for Chesapeake Energy Corporation and/or Chesapeake Operating, LLC, were paid on a day rate basis, were paid/supposed to be paid for that work by Wild Purge I, LLC, were labeled as independent contractors by Chesapeake and/or Wild Purge, and worked more than forty hours in any workweek in the time period relevant to this lawsuit without being paid corresponding overtime premium compensation.

2. The Court hereby **certifies a class action** under Federal Rule of Civil Procedure 23, comprised of Plaintiffs and all affected employees of Chesapeake who worked for Chesapeake Energy Corporation and/or Chesapeake Operating, LLC, were paid by Wild Purge I, LLC, in the Eagle Ford Shale of South Texas, who have not received all straight-time wages owed by Defendants for work completed relative to Chesapeake's oilfield operations. The Court **hereby appoints** Baron & Budd, P.C., as Class Counsel and Plaintiff Wildrick Chad Burns as Class Representative.

3. Within **ten days** after entry of this Order, **on or before March 12, 2017**, Plaintiffs and Defendants are required to **meet and confer** regarding the substance of a proposed notice for the FLSA collective action and the Rule 23 class action and to submit to the Court said proposed notices for its approval. If the parties successfully reach an agreement, they should notify the Court of the same. If there are portions of the notice on which the parties do not agree, the parties should submit their respective positions to the Court for resolution.

4. Any relief requested not expressly granted herein is **DENIED.**

**IT IS SO ORDERED.**


SIGNED this 2nd day of March, 2017.


ELIZABETH S. ("BETSY") CHESTNEY
U.S. MAGISTRATE JUDGE